TENTION TO WAIVE QUARTERLINE   RENÉE COTTIN. Now before you start with the substance, I'll ask again both of you the same question with respect to confidentiality. If you wish to waive all requests for confidentiality, that will make it easier, but you don't have to.  RUBIUS. Yeah, we'll agree to waive confidentiality.  REGAN. Okay. MR. SORELLS. So agreed. MS. REGAN. Okay.  SORELLS. Well, good morning again, Your Honors. May it please the Court. In this case, the District Court made three categories of errors. First it resolved disputed issues of fact, weighing the evidence as if it were sitting as a jury. Second, it reached hindsight conclusions of obviousness without regard for the novel advances in player excitement ushered in by the claimed elements, and without regard for the secondary considerations of non-obviousness, which are particularly dramatic in this case. And third, it improperly narrowed important claim terms. I hope to reach all three. We'll see. But I'd like to be— JUSTICE KENNEDY. Since there are a number of issues here, I want to make sure that the one that I'm particularly interested in doesn't get overlooked. MR. SORELLS. Okay. JUSTICE KENNEDY. If you wouldn't mind directing your attention to the 932 patent and the indefiniteness question, the means plus function clause. We're talking about Claim 10 and the means for generating at least one signal corresponding to at least one of a plurality of displays of said indicia. Can you first explain to me your understanding of what the function is in that clause, and then direct me to where that, with a structure corresponding to that function, can be found?  SORELLS. Sure. Let me explain briefly what our position is with regard to this indefiniteness issue. It's that there is an underlying question of fact that the district court shouldn't have resolved. I understand that indefiniteness is a legal issue, but there's an underlying question of fact, which is whether one skilled in the art would have understood from the specification that there was a link between the structure, which our expert identified as a signal generator with respect to sending signals in terms of the indicia to the wheels, to the secondary  The district court— JUSTICE KENNEDY. I understand that the specifications in the briefs were not helpful. They were very general and not focused, and what I'm trying to do is focus your attention on exactly, first, what the function is, and then exactly where in the specification I will find the corresponding structure. The function is generating a signal corresponding to symbols, a plurality of symbols, of indicia, as they call it. SORELLS. On one of the wheels. JUSTICE KENNEDY. That's right. That's right. SORELLS. We're talking about the wheels now. JUSTICE KENNEDY. Yeah. Here we're talking about the wheels, because the district court found that there was no link between the structure that our expert identified that one skilled in the art would recognize and the indicia on the wheels. SORELLS. This is not the signal that causes that wheel to rotate. JUSTICE KENNEDY. No. No. SORELLS. This is a signal corresponding to the indicia that is displayed. JUSTICE KENNEDY. On the wheels. SORELLS. On the wheels. JUSTICE KENNEDY. Yeah. Yeah. And— SORELLS. And that signal, then, referring to the next cause in Claim 10, if you will, enables the bonus payout indication, or facilitates, or triggers. JUSTICE KENNEDY. Yeah. It triggers it. If you get the right combination of symbols on the wheels, then you get a chance to play the secondary game, or the bonus game. And the generator here is generating a signal that indicates that the regular wheels have come up with whatever it is that is required before you can get to the bonus level. SORELLS.  That's right. JUSTICE KENNEDY. All right. So now, where do we find the structure that corresponds to that function, that is, whatever structure it is that generates that particular signal? SORELLS. What our expert testified is that one of skill in the art would understand from what is disclosed here that a typical, because it was so typical in the art at that time, a random generator would have to send signals. JUSTICE KENNEDY. But the understanding of one of ordinary skill in the art doesn't substitute for a disclosure of structure, which is what the statute requires. SORELLS. Right. Well, it... JUSTICE KENNEDY. I mean, I understand if the specification discloses, if we are talking about a random signal generator, for example, you might make the argument that one of ordinary skill in the art understands a random signal generator to be a piece of structure, and that you don't need to disclose anything more. It is just like disclosing a box with an oscillator or amplifier or any number of other things. But I am not sure. SORELLS. Well, let me try to answer that. JUSTICE KENNEDY. I can't figure out where in the specification we would even find something that one of ordinary skill in the art would then understand to be structure. SORELLS. Well, if you look at Column 4 at the bottom, it says, it talks about whether it is a rotatable wheel or other mechanical indicia. JUSTICE KENNEDY. Where are you on Column 4? SORELLS. Right at the bottom, Your Honor. JUSTICE KENNEDY.  All right. SORELLS. And it says, other visible mechanical indicia can be provided, whether controlled totally mechanically, electromechanically, or electronically, without departing from the scope of the invention. And that kind of language is used throughout here, and I am going to agree with you that it is kind of abstract, but what our expert testified is that one would understand that it is referring to typical signal generators. The district court's problem was that our expert only testified with regard to the wheel and didn't testify with regard to the symbols on the reel. And we pointed out in our reply brief that our expert prepared a diagram, as displayed on page 15 of our reply brief, which drew a dotted line to the reels, which was his way of saying that the same thing would take place to the reels. And we think that a jury should— JUSTICE KENNEDY. Well, he may think that as an expert in the field, but as Judge Linn is asking, where is the structure in the patent? Because my understanding is experts—I mean, an example, you could have a patent on a truck, and you could say that, well, the truck has wheels, and the claim could say, means for making the wheels turn. And an expert would say, well, normally that is going to be an internal combustion engine. But that is not good enough if there is no structure revealed in the patent, right? Isn't that right as a general proposition? You may well be right, Your Honor. But that refers only to Claim 10 of 932. We think that there was enough there, because it was so typical in the industry to use random generators to send these signals, that one of skill and the art would have recognized that that was the structure, or would have been the structure, and that a jury should have determined that. But I would like to move on to other claims, if I may. First, let me give a couple of quick examples of factual disputes that the judge resolved. You know, the judge resolved, relied heavily as prior art on a fortune wheel machine that was made by a British company, and some disputed that it is not prior art because it was never sold in the U.S. But there is a dispute about whether a manual for conversion kits, for converting other before the 1993 critical date. And even though Bailey says there were hundreds of these manuals, it came up with only one, and it doesn't have a date on it. And its only other documentation are some invoices that say fortune wheel machines. It does not say anything about fortune wheel conversion kits. And as we explained in our brief, its witness testimony is inconclusive on this point. This is a classic jury question that the judge should not have preempted, giving all the inferences to the moving party. Another key factual dispute... Why wasn't a Karai declaration unequivocal evidence as to that? I mean, I know you make a contention that Karai shouldn't have been admitted, but the district court addressed that in an order, explained that you had an opportunity to depose Karai, and you didn't use the opportunity and admitted the evidence. What's wrong with Karai as evidence on this? He was testifying many years later, and he just sort of vaguely said it was available before that date. But then he also said, I kept a copy in my files of every manual I received, and yet he could not come up with even one here. And we think we were entitled to explore that on summary judgment. There are big factual issues here. The inferences should not have gone to the moving party. Sounds a lot like the argument we were hearing from the appellant against you. Well, not at all, because here they have zero documentary evidence, Your Honor, that shows that this manual was disseminated before the critical date. That's a big difference from all the documentary evidence that I cited in the prior case. Another factual issue. The question of whether the inventors of the 573... When you say they have zero documentary evidence, you're discounting the invoice, which refers to machines. It refers to machines. Even though there's testimony saying the machines had the manual with them in the conversion case. Well, but it's very unconvincing testimony, I would suggest. They may have had manuals with them, they may have not. We have no corroboration for any of that. Again, they'd only come up, despite all these machines that were supposedly sold, they'd come up with only one manual without a date. It's very weak documentary evidence, and it's not enough, we think, to take it away from the jury. On the 573 question, whether the inventors exercised reasonable diligence before the wheel of gold machine was displayed. In addition to witness, inventor testimony, we have a document, a contemporaneous document, a timeline that shows a series of tasks. And the district court dismissed that as prospective. But I think that misses the point. We do know that the 573 invention was reduced to practice in March of 1996. That's when the patent was filed for, and that's when the prototype was displayed. And the timeline shows that six months worth of work was required in order to reduce that to practice. And if you go back six months, you're before the display date of the wheel of gold. Now that may not be dispositive or a slam dunk, but it's enough evidence, we think, to get to a jury. And again, the judge shouldn't have taken that out of the jury's hands. Were there any inventor notebooks introduced? There was, but it was from the period of conception. It was an earlier period, and so it doesn't exactly speak to the diligence question. Instead, we had inventor declarations. It seems to me that it's a little odd that there are no notebooks. Yeah, I don't know the reason for that, Your Honor, but the fact is that there's not. But we think that this one document is sufficient to raise a jury question, and that the judge should not have resolved it himself. Turning to obviousness, the court and Bailey had mischaracterized the game patent inventions as just putting a wheel on top of traditional, real slot machines. The court should have focused on the actual patent elements, some of which were preexisting in the art, and some of which were totally new. But all of them maximized player excitement to unprecedented levels. Which elements were totally new? There's three. One is the actuator button predetermined by the reels. Let me explain. The conventional wisdom was that the second game had to start automatically, or that it would be too slow or cause player confusion. And a lot of the prior art, it did start automatically. That was how the Shimizu patent was, the vintage Monte Carlo, and the bonus CV. Now, some prior art did have a button, but it didn't actually start the second game. Like in the Pickard patent, it just moved some arrows around. It didn't start the game. And in the Bosch patent, the button, it says right in the patent, is totally unrelated to the primary game. So it wasn't predetermined by what happens on the reels, as is disclosed in the 646 patent. Now, let me explain why this is important. Contrary to the conventional view, it gave the player a sense of control, that it had to push this button. And mythologies develop, like if I just wait seven seconds to hit that button, I'm more likely to win. And the idea of not having a button that times out, you would think it would slow down the game and reduce excitement. But in fact, it allowed the player to call over friends and relatives to say, hey, I just won the bonus game. Come watch. And so somewhat unexpectedly, it actually heightened excitement more than the conventional wisdom taught. The same thing with the next level indetion from the 573 patent. You might say, what's the big deal? It's just a symbol that tells you you get to play the second game. Well, the novel thing here is that it's actually on the reels themselves. So that no matter what happens on the first two reels, the player is focused on that third reel, because I still might get a chance to play that second game. Again, something that led to excitement. And it's not in the prior order. At least there's a factual dispute about whether there was. The district court says it was in the fortune wheel and in the Bosch patent. But Bailey's red brief at 55 admits it wasn't in the fortune wheel. And the Bosch says that the next level indetion was in a window. It's a fourth window, totally separate from the reels, very different than what's disclosed in the 573. Same with the no loss feature in the 573 patent. You can't lose on the secondary game because you don't have to put up a bet in order to play it. And that was something very different as well. It reduces player stress and therefore makes the game more fun and exciting. Bailey admits that the fortune wheel had losses on the secondary game. It's at pages 55, 56 of its brief. And the vintage Monte Carlo, you had to bet on the secondary game. And there were other elements as well. And combining them just revolutionized the gaming industry. It sounds like Larry's hyperbole, but Bailey's expert said the wheel of fortune was the most successful gambling machine in history. And most of these machines, most of these successes, they have their 15 minutes of fame and then get pushed out by the next big thing. But the wheel of fortune, the commercial embodiments of these patents, has been at the top of the heap for over a decade now and is still going strong. And that's objective evidence of non-obviousness. And the same thing is true with the player tracking patent, which the court suggested was just throwing a touch screen on existing art. Player tracking, there were two ways to do it before the 698 patent. You could have separate player tracking units which had mechanical keypads and little small LED screens that had very limited functionality. You also had gambling machines like the Gambler's Bonus, on which the district court relied. Now we think there's a factual dispute about whether that was in the prior art too, but in any event, it was just a video poker machine that had some player tracking functionality integrated into the same touch screen display. And so it was very limited. And it didn't have the enhanced functionality, the logic device, or the gaming logic that's disclosed by the 698. And the prior art taught away from having a separate player tracking touch screen because it would be clunky and would distract players from the main game. That's in the Heidel patent, that's in the appendix, and in the Heidel and Venner's testimony. I'd like to quickly turn to claim construction. It looks like I have time only to give maybe one that will sort of exemplify where I think the district court went wrong in its claim construction. Proceed, we will give you both the extra time you need. Thank you, Your Honor. Well, I don't know if you have your appendices handy, but in volume one, page 167, it might be helpful to start. The claim from here is from one of these player tracking patents, and it's the term keypad interface for entering alphanumeric data. And the district court construed that to mean that you had to have individual letter keys from A to Z like you have on a typewriter keyboard. Now, the claim language doesn't say that, but the district court relied on this embodiment, figure 3E, which does have individual letter keys. But if you flip the page back, there are four embodiments of keypad interfaces that do not have individual letter keys. And if you go back to where we started, on the facing page, there's figure 4A, which is an entire unit that has a keypad interface that does not have individual letter keys. So you've got six embodiments of keypad interfaces. One of them has individual letter keys. Five of them don't. And yet the district court ruled that this was a requirement of the 698 patent to have individual letter keys. And that's just mystifying claim construction. Let me go on to the game patents. I want to talk about the based-on element. And if you have your appendix open, if you could look at page 233. Based-on is kind of a broad causation term in the 646, but the issue here is whether the random generator has to communicate payout amounts, dollar amounts, to the control unit. That's what Bailey and the district court say. Or whether it's enough that it communicates stop positions corresponding to payout amounts, which is what we say. And I think this embodiment shows why we have to be right. Because if you look at it, you'll see the number 50, $50 on the wheel, three times. Once at the top, and then twice at the bottom. So if the generator communicated the number 50 to the control unit, it wouldn't know where the wheel should stop. There's three different potential places. Whereas if it communicated a stop position, which is what we say, it necessarily would communicate a payout amount because there's only one payout amount per stop position. And in addition, as we pointed out in our brief, the only control unit disclosed in the specification is a motor. Motors can deal with stop positions, but they're not very good at dealing with payout amounts. So again, that undermines the suggestion that it had to do payout amounts. If I could ask you now to turn to page 241, again, of volume one of the appendix. What I want to talk about here is, if you look at claim 27, about six lines down, it's referring to the secondary indicator. It says a mechanical member that is movable about an axis. And the district court construed that to mean a wheel, or a wheel-like device. Of course, the claim language doesn't say that. It says a mechanical member. If you look on the facing page of claim three, about six lines down, it discloses a movable mechanical payout indicator comprising a rotatable wheel. So claim three does disclose a wheel. Claim 27 just discloses a mechanical member. Yet the district court says claim 27 must mean the same thing as claim three. Now, that shouldn't be right. And in fact, my view is supported by the specification. If you look on page 237, all the way at the bottom of column four, the district court relied on wheel embodiments. But it says here, while the illustrated embodiment of the present invention is generally in the form of a rotatable wheel, other visible mechanical indicia can be provided without departing from the scope of the present invention. Yes, but you're not saying that that constitutes a disclosure and an enablement of everything in that boilerplate kind of paragraph. No, but it does show that what the inventor was claiming here was broader than a wheel. That starts on the very first page of the patent in the abstract, where he says a payout indicator, e.g. a rotatable wheel. The art was well aware of mechanical rotating indicators that were not wheels. For example, the Bosch patent, which we mentioned, it had a stationary wheel with a clock hand that rotated around it. Well, that would fit claim 27, but it would not fit the district court's construction. And there's no indication that that was not enabled. In fact, the art had it enabled. So this was really an impermissible narrowing of what the claim discloses based on one disclosed embodiment, the wheel embodiment. The district court also- I think we need to move on. We'll save you rebuttal time. And would you enlarge Mr. Verhoeven's time by whatever it takes to match? I'd appreciate the time, ma'am. Thank you. Good morning, Your Honor. May it please the Court. On this appeal, IGT seeks patent protection merely for the idea of putting a wheel on top of a slot machine. The evidence shows, and the district court found, that not only is this obvious, it had been done before. There's two patents at issue. There's a number of issues in this appeal, obviously. But the two patents at issue I'm referring to are the 646 patent and the 573 patent. We should start, I submit, by asking ourselves, taking one or the other of these, what is it that was new or unique that was invented by the inventors in these patents? So if we start with the 646 patent, Your Honors, I ask the inventor, what is it that you invented, Mr. Randy Adams? And he testified that the company of putting a Wheel of Fortune-type event on top of a gaming machine. I asked him, is there anything else you invented? He said, I can't think of anything else I invented. He testified that he came up with the idea by watching the Wheel of Fortune game show. He testified that he doesn't know how to program code. He testified that he couldn't have even physically affixed a wheel on top of a slot machine. He's an idea man, that's all he is. The idea that people are very rare can hire somebody to do the programming. Well, but the issue, I would submit, Your Honor, is whether that idea, just simply putting a Wheel of Fortune-type event on top of a slot machine, in and of itself was something that was new or unique. And Your Honor... Aren't we concerned about the claims and the claims that were presented, not simply the idea underlying it? Yes, we are, Your Honor. We need to look at all the elements of the claims, and as IGT argues, we need to look at the claims as a whole. But it's also helpful to have some understanding as to what was the belief, either expressed in the specification or by the inventors, as to which aspect of the claims are the new or unique element. And this is all we have. The idea may be interesting, and all of this may be of general interest, but, you know, the devil's in the details. So we have to look at the claims, the claim language, and then examine the district court's ruling to see whether there is a sufficient evidentiary basis to support the conclusion that these claims are invalid under 103, for example. That's absolutely right, Your Honor. And in this case, and this is the point IGT makes, you need to look at every element of the claims. In this case, IGT says there's three things they point to. They say they weren't in the prior art, and it wouldn't have been obvious to combine them. Let's take each of them, Your Honors. The first is the concept of predetermined result. And this relates to the 646 patent. I'm grouping these patents together, for the record, Your Honors. The idea that you would use a random number generator to have a predetermined result is something they point to. They say it's not in the art, and they say it wouldn't have been obvious to combine. Okay. Well, Your Honors, we cite to the Telness patent, issued in the 80s. The Telness patent is not just your average patent. It was a very significant patent. The Telness patent resulted in, characterized by counsel for IGT, a revolution in the gaming industry. The Telness patent clearly disclosed, as counsel admitted earlier today, the concept of using a random number generator to get a predetermined result. So IGT is incorrect. In fact, the idea of having a predetermined result using a random number generator is in the art. It's been in the art since the 1980s. Indeed, you're required by law to use random number generators in slot machines. By the early 90s, everybody was using random number generators to get predetermined results. So the second question would have been obvious that you'd use a random number generator for this machine. If I'm an inventor, and I come up and I see I've got prior art with a wheel on top of a slot machine, which we've disclosed to all of you in the record, there's several prior art references that disclose that combination. The question becomes, would it have been obvious that you'd use a random number generator in connection with that secondary wheel? The answer is indisputably, unequivocally, yes. That's the way everybody did it. That's the way slot machines worked in the early 90s. Every single manufacturer of slot machines used random number generators. They had to. I think Mr. Sarles would have liked your testimony in the first case. Well, I'd say in the first case, Your Honor, Ms. Candido didn't address this in a rebuttal, but I would say, just to make it very clear, we are not saying in that earlier case that it wouldn't be obvious to combine Telnes. We're being consistent, and IGT is not being consistent. In this case, they're saying it wouldn't have been obvious to use a random number generator. A position, I would submit, doesn't pass the red face test. And in the Telnes, or in the earlier case, they're taking the exact opposite position, which is one of the reasons why, well, is the reason why the judge of the district court found that they were stopped from taking that position in this case, because they had successfully taken the opposite position in the earlier case. So that's the first thing they say renders the 646 non-obvious. What's the second one? They've got three. Second one, actuator button. Well, what's an actuator button? It's a button you push that spins the wheel. That's all it is. A button you push to spin the wheel renders your invention new or unique. We already know that a wheel on top of a slot machine is in the art. We've cited fortune wheel, pick art, and a couple of other references I can go into if you'd like, that have the pictures of the wheel on top of the slot machine. Well, I think, to be fair to Mr. Sarles, he didn't limit himself just to actuator button. In fact, he and I had an exchange on this point. I'm sure you're... It has to be combined with all the other things. Right. It has to be an actuator button that operates in a certain way in following a certain event. He says that isn't in the prior art. Correct, Your Honor. And this brings us all the way back to KSR, doesn't it? And KSR says, when you're merely combining things that are well known in the prior art, just because you combine them and claim them in a specific way doesn't give you a patent. When they perform the same functions in the same matter that doesn't lead to unpredictable results under KSR, that isn't enough to give you a patent. You can't simply say, oh, no one's bothered to claim a specific combination in a specific way so I should get a patent on that. Under KSR, the Supreme Court has said that takes away opportunities for skillful men and women to be able to develop new technologies. And that's beyond what patent protection should give you. An actuator button to spin a wheel. In the early 90s, I would submit you could go into any casino and see an actuator button that you could push that would spin a slot machine wheel. An actuator button you could push to spin slot machine reels. Now, I don't know if you ever have been into a casino, but remember they used to have handles that you'd pull to spin the wheels. They still have those handles. But no one ever uses them. Why? They have actuator buttons. It's faster. So the notion that this element is going to render these two patents protectable again, I would submit doesn't pass the red face test. So that's number two. They've got one more thing that they pointed to. What is that? It's the next level in dishing. The first two are the only two that they pointed to for the Adams patent, the 646 patent. This third one is for the Wheel of Fortune patent, 573 patent, which again just like the 646 patent claims putting a wheel of, it's more specific, putting a Wheel of Fortune wheel on top of a slot machine. And so for the 573 patent, the third thing they point to is this phrase, next level in dishing. What does that mean? Well, that's a fancy language simply for a symbol that tells a user that they're entitled to play the secondary game. That's it. A banana on a reel is a next level in dishing. Now, the question is I already know from the prior art about the idea of putting a wheel on top of a slot machine so you have a secondary game. We've already showed that in the prior art. They don't claim that's not in the art. They claim this next level in dishing is not in the art. So the question becomes if I'm a person of ordinary skill in the art and I already have the idea to put a Wheel of Fortune on top of a slot machine, would it be obvious to me to include a symbol on the base game that indicates to a user hey, you're entitled to spin the wheel. Now Mr. Verhoeven, you know that that's not the standard whether you take an individual isolated element and see whether that element is or isn't in the prior art. And as you work your way through the claims of these patents, you get down near the end to claims that have four or six or eight elements in combination and it's the invention as a whole and the combination as a whole which is the standard not whether any individual one plucked out can be found somewhere in the prior art. That's absolutely correct Your Honor, and the reason I'm addressing these specific points is because in the briefing, we have submitted voluminous evidence before the district court and on the of prior art that we believe in combination renders these patents obvious and in response to that we've gotten these three points that were made about items that were not in the art and that would not be obvious to combine. And so I'm simply addressing the three points that they have addressed but I agree with Your Honor. In combination with all of the other elements in the particular claims which is the way it needs to be reviewed. It does need to be reviewed that way, Your Honor. I absolutely agree but in order to analyze it analyze which of those elements are something that renders the patent unique I'm simply responding to the elements that they have pointed to that they say are not in the art and it would render the patent unique and they have pointed to this next level indicium which is simply a symbol that tells a user that the user is entitled to play the wheel and we pointed to prior art in fact that shows the next level indicium the Bona Sevi prior art and the Bosch prior art Your Honors. But my point is simply even if we didn't have a specific reference that had an actual indicium that says you're entitled to play the game, the notion that it wouldn't be obvious to a person that you'd be able to do that again would assume that a person of ordinary skill wouldn't have basic understanding of how users play games. They want to know when the secondary wheel when they are entitled to play the secondary wheel. Well an indicator that says you're entitled to play the secondary wheel I would submit would be pretty obvious. In terms of the evidentiary arguments that are made on this obviousness point IGT points to the fortune wheel conversion manual and says that was improperly considered. We dispute that but as a preliminary point Your Honors I'd point out that even if they were correct that's not dispositive here. We've cited the Picard and the Shimizu references which also are basically cumulative of the fortune wheel reference. The Picard reference is a published patent and so is the Shimizu reference and there's no argument that those references aren't prior art and both of those references also disclose a wheel on top of a slot machine. So we would submit even if Your Honors agreed with IGT and we hope you don't on the evidentiary point that it doesn't change the result here. In terms of the arguments they make on the fortune wheel we have submitted to the district court testimony from four witnesses, disinterested witnesses corroborating the manual and interestingly Judge Bryson pointed out the tension between the arguments on the two appeals here as to corroboration and whether there's enough evidence here. I think an interesting point to note is the dispute in the prior argument went to functionality. There was no actual machine in existence and people were talking about how it worked so there's a question of the basic functionality of the prior art. The dispute here on fortune wheel is simply as to the date so there's a distinction there but for example the evidence here clearly rises to the sufficient level to be relied on by the district court. Mr. Booth testified that he let me take a step back to give some context because these briefs there's so many issues in these briefs are in some senses if we had more words beyond our word limit we might be able to make them a little bit clearer but on the fortune wheel, just to give your honor some background, there's a company called Project Coin and that company was in Europe and it made games and it came up with this game fortune wheel and it sold fortune wheels but it also sold conversion kits that a subcontractor that would sell to could then take an existing Project Coin game just like a regular slot machine and buy the conversion kit and they'd get the wheel they'd get the conversion manual and instructions and they'd assemble, they'd basically build a fortune wheel machine using a base game and that's why there's this conversion manual and the conversion kits and Mr. Booth purchased a converted fortune wheel machine and he testified that in March of 1993 he received that machine and it included the conversion manual that was used to convert it into the fortune wheel machine what do we have? We have his testimony he's a disinterested witness we have the actual manual he received with his machine that's what we're relying on in 1993 he testified that he remembered getting it he testified that he got two fortune wheels and he remembered that this was the first one he got he had a specific recollection of it we have the invoice that corroborates it and the testimony there's testimony relating to the invoice in which a different individual Mr. Bolton who sold the machine testified specifically that that invoice related to a converted machine but aren't these all questions of fact? They were all decided on summary judgment. No there's not a dispute of fact and this again is similar to the question that Judge Bison asked in the earlier appeal it's not a dispute of fact the question is whether there's sufficient evidence that this is prior art and there's no contrary evidence so it really goes to is it corroborated? is it enough evidence that you can rely on it under this court's precedence? Well enough to rely on it has to be stronger than nothing right? It has to be enough that we could conclude that no reasonable jury could conclude to the contrary. It isn't just enough evidence to be sufficient to sustain a verdict had you had a verdict in your favor. I think I would agree with that Your Honor it certainly needs to be corroborated under the court's precedence and it is corroborated and here we've got four different witnesses and I would submit Your Honor that no reasonable jury could conclude that this fortune wheel was not that this manual was not published, available to the public prior to 1994. We also have the advertisement Your Honors that was published which has a picture of the fortune wheel and specifically refers to conversions conversion kits that are available for sale to the public. That's August of 1993 Your Honors and we have three different witnesses who corroborated that advertisement and corroborated that these were available to the public before this advertisement, August 1993. The critical dates in the patents here are 1994. So we would submit that in answer to Judge Bryson's question we would submit that no reasonable jury could conclude otherwise. There's no contrary evidence whatsoever in the case. So I can turn quickly to Your Honor's question on the 932 and indefiniteness. Judge Bryson had two questions to I think it was Judge Lynn I think. I apologize. No problem. What is the function and where is the structure? And I agree with counsel as to the function but it's very important that we ask that preliminary question. What is the function? And the function is that the signal simply activates the wheel. It does not it is not the random number generator that controls the spinning of the wheel. That's something else. It does not determine where the wheel stops. That's not what the function is. The function is simply a signal that's generated when one of the at least one symbol is on the base game and that signal tells the wheel, okay, turn on, you're activated. That's it. So the second question is where is it? And the answer is it's not there. It's nowhere in the specification. Below IGT referred to column 4 lines 40 through 45 which is a description of the random number generator controlling the spinning of the wheel. Apparently counsel has abandoned that because in response to your honors questions he did not identify that section and I would submit to your honors that is not the structure. That is talking about a completely different function. That is controlling the spinning of the wheel and where the wheel stops. It is not talking about the correlation between the base game having a symbol that causes a signal to activate the wheel. That's a different function and it's not in the specification anywhere and the district court's conclusion that the patent, that claim 10 is indefinite should be affirmed. Finally in my last 15 seconds your honors I'd like to address the 698 touchscreen patent and here also the district court's decision on obviousness is plainly correct. Here also we have two pieces of, well here we have if I could just have five seconds I'll finish this. We have the innovation simply is taking existing player tracking systems which existed in the art that had an alphanumeric keypad that the user would press and replacing it with an off-the-shelf touchscreen. Under KSR and especially under this court's decision in leapfrog that is obvious. The district court's finding that it's obvious should be affirmed. Thank you your honors. Is a function button an alphanumeric key? If a button that says stop or play or repeat in other words it has a word not a letter or a number is that an alphanumeric key? I would submit your honors that that would be a function key as distinguished from an alphabetic input key or numeric input key. You have alphabetic keys, you have numeric keys and you have function keys. The claim uses the phrase alphanumeric. What does that refer to? Well it refers to... All three categories? If it's just alphanumeric your honor I would submit that it refers to letters and numbers. Not function keys. I don't necessarily exclude that your honor but the phrase alphanumeric So it covers alphabetic and numeric? It doesn't exclude but it specifically covers at least alphabetic and numeric. I think the important point is that it requires both alphabetic input A, B, C, D and numeric 1, 2, 3, 4 and yes there are pictures in the spec that show different interfaces but the claim that we're talking about corresponds I think it's figure 3E in the patent which clearly shows alphabetic and numeric input. Thank you your honors. Any more questions? Thank you Mr. Verhoeven. Thank you. Mr. Sarles. Your honor, Mr. Verhoeven began with what I would call a straw man argument saying that we say that the predetermined result element was not in the prior art. That is not our position. We certainly understand that the tellness method was in the prior art. We don't take inconsistent positions in the two cases. We don't say that it wouldn't be obvious to apply that real method to wheels. What we do say is that tellness disclosed a one level slot machine. We say that it would not be obvious to combine it with all these other elements that maximize player excitement that are disclosed in the two level games that are issued here. You know, Mr. Verhoeven sort of made fun of the idea that actuator buttons were not in the prior art. But the district court construed actuator button here as a button that is activated by the predetermined real display. And that's something that did not appear to exist in the prior art. Some of the prior art that Mr. Verhoeven cited, like the picker patent, it describes itself as a game of skill because the button there is designed to move arrows. The player gets to put it where the arrows are. It's a very different type of invention that we're talking about here. And as I said, many of the prior art disclosed automatic play of the secondary game without a button at all. He talked about the deposition of Mr. Adams where he under deposition questioning said the invention was putting this wheel on top. But Mr. Adams also said repeatedly and almost ad nauseum, if you want to know what the invention is, look at the claimed elements. There's a magazine article in the appendix that talks about Mr. Adams and how he came about coming up with these inventions. And what he said is that the current generation of inventors, they were too busy dealing with mechanical issues and the odds of making things profitable for casinos. He said they were ignoring what makes these games exciting and fun to play. So he prowled through the casinos interviewing players and the old cases talk about flash of genius. Well that's kind of what we're dealing with here. His genius was to understand that you had to combine elements, some of which were pre-existing in the art and some of which were not. And despite what Mr. Verhoeven says, the next level that was on the wheels themselves did not exist in the prior art and he ignored the no loss element, the no loss feature on the secondary game, which was not in the prior art. And Mr. Adams and the other inventors here, their genius was to figure out how to combine these in a way that would just make players want to keep playing them. And that explains, I think, the objective evidence of non-obviousness, the great success of the commercial embodiments. So, you know, this is very different from KSR and I'll just conclude by saying the two ways that I think it's very different. One, in KSR the Supreme Court says there were no factual disputes about whether any of the elements were in the prior art. And here there are definite factual disputes and if you actually look at what those four witnesses said that Mr. Verhoeven talked about, for example, with regard to the fortune wheel manual, you'll see that they're not dispositive at all. They were very genuine material questions of fact. And secondly, it's different from KSR because here there's no evidence that one skilled in the art reasonably would have selected these elements and combined them in this way. It's a much more complex situation. We've got Bailey's expert testify that there's an infinite number of variations in game design and the inventors in question here were able to see through all that infinity and come up with a combination of elements that ran against the grain of conventional wisdom and proved to have enormous success and, as I say, revolutionized the game industry. Could I ask just one narrow factual question? It's actually a question about the party's position. If we reject your argument with respect to the wheel of gold as prior art, that is to say we agree with the district court that there's no showing of due diligence, does that invalidate the 573? Your Honor, I think that's the only one where that would be true. The answer is yes. On all the other prior art, we have factual disputes about whether it's prior art at all. We do have serious distinctions in terms of the elements. I understand. I just wanted to make sure that that at least was dispositive. Yes, it is. As I said, I think we do have enough because of that contemporaneous document to make that a factual issue for a jury. Thank you. Any more questions? No questions? Thank you, Mr. Cyrus and Mr. Verhoeven. The case is taken under submission. All rise. The Honorable Court is adjourned until tomorrow morning at 10 a.m. There he is. That's all that's recorded.